IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

JAMES HALL and            )
N.C. "CLINT" MOSER, JR.,   )
                          )
    Plaintiffs,           )
                          )
v.                        )      CIVIL ACTION NO.
                          )      2:13cv663-MHT
JOHN MERRILL, Alabama     )         (WO)
Secretary of State,       )
in his official capacity, )
                          )
    Defendant.            )

OPINION

Plaintiffs James Hall and N.C. "Clint" Moser, Jr.
planned to run in the December 2013 special election to
fill the vacant United States House of Representatives
seat in Alabama's First Congressional District.
However, neither timely submitted a petition with the
number of signatures required under state law, and, as
a result, neither appeared on the ballot.

Pursuant to 42 U.S.C. § 1983, Hall and Moser filed
this case against Alabama's Secretary of State, raising
First and Fourteenth Amendment challenges to the

constitutionality of Alabama's ballot-access laws in the context of such a special election.[1]   They raise an equal protection claim as well.   Jurisdiction is proper under 28 U.S.C. § 1331.

Currently before the court are Hall and Moser's motion for summary judgment and the Secretary's motion for summary judgment.   Based on the record, as well as the oral arguments conducted before this court, the court will grant summary judgment in favor of Hall on his First and Fourteenth Amendment claim, and grant summary judgment in favor of the Secretary on Hall's equal-protection claim. Because the relief to be afforded to Hall is identical to the relief sought by Moser, the court need not decide whether it has jurisdiction to hear, or evaluate the merits of, Moser's claims, and his claims will be dismissed as moot.   The motions will be denied in all other

---

1. John Merrill has replaced Jim Bennett as Alabama's Secretary of State and is automatically substituted as the official capacity defendant in this action.  Fed. R. Civ. P. 25(d).

respects.

## I.   SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.   The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.   <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).   The Rule 56 standard is unaffected by the filing of cross-motions for summary judgment.   <u>See</u> <u>Gerling Global Reins. Corp. of Am. v. Gallagher</u>, 267 F.3d 1228, 1233 (11th Cir. 2001).

## II.   FACTS

### A.  Alabama's Ballot-Access Scheme

Alabama law provides a prospective candidate with different routes onto the ballot, depending on whether the candidate runs as a member of a political party or

3

as an independent.   A political party is defined as an organization whose candidate received more than 20 % of the votes cast in the last general election in the relevant political subdivision.   1975 Ala. Code § 17-13-40.   Candidates who run as a member of a political party have their names placed on the ballot after they prevail in their party's primary—election processes.   1975 Ala. Code § 17-9-3(a)(1).

Independent candidates, on the other hand, must seek to have their names placed on the ballot through signature petitions.   Alabama law requires an independent candidate to gather a certain number of signatures of qualified electors--that is, voters registered in the relevant political subdivision and therefore eligible to vote for the candidate.   Alabama law sets this signature threshold at 3 % of the number of voters who cast ballots for the office of Governor in the last general election in the political subdivision in which the candidate seeks to qualify. 1975 Ala. Code § 17-9-3(a)(3).

Any qualified elector may sign a petition

regardless of whether the signer actually voted in Alabama's last gubernatorial election or intends to vote in the election in which the candidate wishes to appear on the ballot.  There is no requirement that a signer be unaffiliated with a political party, no prohibition on signers voting in a party primary, and no prohibition on signing multiple petitions.  There is no fee for the Secretary of State to verify the signatures, and there is no requirement that the signature petition be notarized or witnessed.  Since not all signatures on petitions will be valid, there is no limit on the number of signatures that a candidate may submit, and petitions may be submitted in parts, although no part may be submitted after the deadline.

State regulations require that any signature petition contain a header that with the "name of the prospective independent candidate, the date of the general election for which ballot access is sought, and the name of the office sought, including the district number, if applicable."  Ala. Admin. Code R. § 820-2-4-.05.

Independent candidates must file their signature petitions with the Secretary of State's office by 5:00 p.m. on the date of the first primary election.   1975 Ala. Code § 17-9-3(a)(3).

### B.   The December 2013 Special Election

#### 1.

On May 23, 2013, Representative Jo Bonner announced his retirement from the U.S. House of Representatives, effective August 15, 2013.   That date was eventually moved up to August 2.   His retirement left Alabama's First Congressional District, which is in southwestern Alabama, without a representative.   Although the Governor had not yet announced a date for a special election, Democratic, Republican, and independent candidates filed statements of organization from mid-June to early July.

Hall contacted the Secretary of State's office in early June to verify that he could begin collecting signatures for his independent candidacy in compliance with Alabama law.   On June 7, Hall e-mailed the office

with a draft petition to verify that it conformed to Alabama laws and regulations. He was concerned that the header on his signature petition might not conform, since the Candidate Filing Guide published on the Secretary of State's website, which he had consulted, stated that signature petitions must contain the "date of the general election for which ballot access is sought." Hall Decl. (doc. no. 25-1) at 6; Sec'y of State's Candidate Filing Guide (doc. no. 16-3) at 2; Ala. Admin. Code R. § 820-2-4-.05. At the time Hall contacted the Secretary of State's office, sample petitions had been posted on its website for regularly scheduled elections, but not for the special election. As the date of the special election had not been announced, it was impossible for Hall to include it on his signature petition.

On June 11, 2013, Alabama's Director of Elections reviewed Hall's draft petition and changed its header to indicate that it was a petition to place Hall on the ballot "in the Special General Election to be held on a date yet to be determined ...." Packard Aff. (doc. no.

23-1) at 3-4.   The revised signature petition was sent to Hall, and he acknowledged its receipt the same day. This revised header appeared on the completed signature petition he eventually submitted.

On July 26, 2013, the dates for the special primary election and special general election were set by court order in United States v. Alabama, No. 2:12-cv-179-MHT (M.D. Ala.), a case seeking to compel Alabama to comply with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 42 U.S.C. § 1973ff.   UOCAVA provides that, no later than 45 days before a federal election, States must send ballots to military and overseas voters who have requested them.   See 42 U.S.C. § 1973ff-1(a)(8)(A).   The court order set the special primary election for September 24, 2013, and the special general election for December 17, 2013, because those dates would allow enough time to mail UOCAVA-compliant ballots for both elections.

The Secretary of State's office publicly announced the date of the special primary election and special general election three days later, on July 29, 2013.

Hall did not learn of the date of the special primary election--and, hence, the date his signature petition was due--until that announcement was made.

The parties agree that meeting the 3 % signature requirement for Alabama's First Congressional District required at that time 5,938 valid signatures.   They dispute, however, how much time Hall had to collect those signatures.   Hall contends that independent candidates had 56 days to obtain the necessary signatures; he arrives at this number by calculating the time between the July 29 announcement of election dates and the September 24 petition deadline and excluding both the start and end dates.[2]  Hall uses July 29 as the start date because that is the earliest date an independent candidate could have begun gathering signatures using a signature petition that included the date of the election in its header.   The Secretary

---

2.  Hall presumably excludes the start and end dates in order to reflect his belief that a candidate cannot reasonably be expected to gather signatures on either the day the election date is announced or the day on which the signatures are due by 5:00 p.m.

argues, however, that Hall had 106 days to collect signatures, beginning on the day of the June 11 e-mail correspondence between Hall and the Secretary of State's office and ending on the September 24 petition deadline.

On or around June 11, 2013, Hall began gathering signatures and worked "tirelessly throughout the months of June and July" to collect signatures for his ballot petition.  Hall Decl. (doc. no. 25-1) at 2.  He attempted to gather signatures at places of business and at public events such as "charity runs, festivals, yard sales, concerts, sporting events, a gun show, and others."  Id.  He also used social and work contacts as well as friends to obtain signatures.  He and his wife went to approximately 5,000 homes in an effort to obtain signatures.  He was able to obtain roughly one signature for every 12 houses visited.

Eventually, Hall placed an advertisement to hire someone to gather signatures on his behalf, but he received only one response.  Employing that signature collector would have cost him approximately $ 4.00 per

10

signature, which he could not afford to pay.   Hall attests that his efforts to collect signatures were impaired by his inability, given the short lead time, to organize an effective signature drive.   According to Hall, his efforts to obtain signatures were also impaired during the period preceding the July 29 announcement of the special election date because voters were unaware of the election and had no interest in it.

Hall timely filed a signature petition containing 2,835 signatures with the Secretary's office on September 24, 2013.   Since this number was well short of the 5,938 signatures required, the Secretary's office informed him that it would not attempt to verify the signatures and that the number of signatures was insufficient to provide him with ballot access.   After the September 24 deadline, Hall continued to collect signatures and was able to obtain an additional 451 signatures.

2.

Moser, like Hall, also wanted to run as an independent in the December 2013 special election. After Representative Bonner announced his retirement, Moser met with a friend, who had been the campaign coordinator in Alabama for Ron Paul and had managed Paul's signature campaign, to discuss strategies for Moser's signature petition. According to Moser, this friend attempted to contact over 100 of his former contacts from the Paul campaign to collect signatures for Moser and to set up a Facebook petition page. Despite those efforts, however, Moser and his associate were able to find only one volunteer, and he was able to obtain only 750 signatures by September 24. Moser, like Hall, was concerned about collecting signatures before a date for the election had been announced because the Candidate Filing Guide from the Secretary of State's website stated that a signature petition must include the date of the election. Moser and his associate feared that any signatures they might collect before the date of the election was announced would be

12

rejected as invalid upon submission.

3.

Joshua Cassity, the Chairman of the Constitution Party of Alabama, has also submitted a declaration in this case. He states that the Constitution Party's candidate was able to achieve ballot access for the 2010 general election for the House of Representatives in the First Congressional District. The Constitution Party knew that its signature petition was due in June of 2010 and began planning its signature petition in November 2009. After early efforts provided mixed results, the Constitution Party spent $ 12,000 to $ 15,000 to hire signature gatherers. With the help of the paid signature gatherers, the Constitution Party was able to meet the 3 % requirement and obtain ballot access for its candidate.

Cassity wanted to place a Constitution Party candidate on the ballot for the special election to fill Representative Bonner's seat but decided the party could not acquire the required signatures in the

shortened timeframe for the special election.  Like
Moser, Cassity was concerned about gathering signatures
using a petition without the date of the election on it
as required by the Candidate Filing Guide.  Although an
employee of the Secretary of State's office told
Cassity to begin gathering signatures and then add the
date of the election to the petition once it was
announced, Cassity did not want to rely on an
employee's suggestion when it was contradicted by the
official materials contained on the Secretary of
State's website.  As a result, the Constitution Party
did not attempt to gather signatures for the 2013
special election.

### 4.

Hall was the only independent candidate to submit
signatures to the Secretary of State for the December
2013 special election.  Because he did not meet the 3 %
requirement, no independent candidate was on the ballot
for the special election.

**14**

## C.  Procedural Background

On September 17, 2013, Hall and Moser filed their complaint against the Secretary.  In the complaint, as later amended, they requested (1) a declaratory judgment that the ballot-access scheme for the special election was unconstitutional, (2) a preliminary and permanent injunction prohibiting the Secretary from enforcing the ballot-access laws for the special election, (3) an order extending the filing deadline and decreasing the number of signatures required for them to be placed on the special-election ballot, (4) a preliminary and permanent injunction requiring the Secretary to certify Hall as an independent candidate on the special-election ballot, and (5) an award of attorney's fees and costs.

On November 2, 2013, while this litigation was pending, UOCAVA-compliant ballots for the December special general election were mailed to overseas voters as required by federal law; they did not include Hall's name as a candidate.  Since the Republican primary required a runoff on November 5, the UOCAVA-compliant

15

ballot included the names of all the candidates who participated in the Republican runoff, so that overseas voters could receive their ballots in compliance with federal law but still vote for the winner of the Republican runoff, should they so choose.  On November 13, after the runoff, updated ballots containing only the names of the candidates who were to appear in the general election were finalized; these ballots were mailed on November 19.  Overseas voters were permitted to use the later ballots, if they received them in time, or the earlier ballots, if they did not.  Hall requested that the court enter an injunction requiring the placement of his name on the updated ballot.

On November 13, the same day the updated ballots were sent to the printer, the court[3] held a hearing on Hall and Moser's motion for a temporary restraining

---

3.  Until August 20, 2014, Judge Mark Fuller presided over this case.  However, this court has reviewed the transcripts of all proceedings that took place before him.

order or preliminary injunction.[4] The court heard argument from the parties based on their written submissions and made an oral ruling from the bench denying the motion. Among the reasons the court gave was that, because the UOCAVA-compliant ballots had already been mailed to overseas voters without Hall's name on them, requiring the State to issue a new ballot containing Hall's name would result in the special election having to be rescheduled. The court emphasized that rescheduling the special election would result in a great expense to the State, risk voter confusion, and increase the time Alabama's First Congressional District went without representation in Washington.

The next day, Hall and Moser filed an emergency appeal of the court's oral order. On December 12,

---

4. At the hearing, the court also briefly addressed the Secretary's motion to dismiss and, in the alternative, for summary judgment. The court denied that motion to the extent it sought dismissal of Hall and Moser's claims, instead construing the motion as solely one for summary judgment and taking it under advisement. That motion is now before the court.

2013, the Eleventh Circuit Court of Appeals affirmed the court's ruling on the ground "that the injury to the public from the issuance of an injunction would far outweigh any injury appellants might suffer." <u>Hall v. Sec'y of State, Ala.</u>, 547 F. App'x 962, 963 (11th Cir. 2013) (per curiam).

Implicit in this court's and the appellate court's reasoning was the so-called <u>Purcell</u> principle. This principle of election law essentially means that, because of the risk of voter confusion, courts as a general rule should be reluctant to allow last-minute changes to the status quo. <u>See Purcell v. Gonzalez</u>, 549 U.S. 1 (2006) (per curiam). If the election challenger seeks to maintain the status quo, the <u>Purcell</u> principle could arguably weigh in favor of the challenger. And, of course, the <u>Purcell</u> principle should be considered along with all the other factors that courts use in determining whether to grant a temporary restraining order or a preliminary injunction.

The special general election was held on December

18

17, 2013.  Republican Bradley Byrne was elected as the Representative for Alabama's First Congressional District.  On December 26, 2013, the Secretary filed a motion to dismiss for lack of subject-matter jurisdiction, arguing that the case was mooted by the completion of the special election.  The court rejected this argument, finding that the controversy fell within the "capable of repetition, yet evading review" exception to the mootness doctrine because there was a "demonstrated probability that the government will hold future special elections where independent candidates must comply with Alabama's 3 % signature requirement under a truncated petition deadline," and, therefore, that Hall and Moser had "established a reasonable expectation that future special elections in Alabama will burden the same constitutional rights and interests at issue here."  Hall v. Bennett, 999 F. Supp. 2d 1266, 1270 (M.D. Ala. 2014) (Fuller, J.). Furthermore, the court found that Hall and Moser met the mootness exception's "same complaining party" requirement--assuming, without deciding, that this

requirement applied--because there was a reasonable expectation that Hall and Moser would run as independent candidates or vote for independent candidates in future special elections. Id. at 1272.


### III.  DISCUSSION

Hall and Moser challenge Alabama's ballot-access scheme in the context of a special election timeframe. Specifically, they argue that Alabama's 3 % signature requirement and the shortened timeframe for meeting it violated their First and Fourteenth Amendment rights as candidates to associate and to participate in the political process, and as voters to associate and to cast their votes for independent candidates, all without serving any compelling state interest. They also bring an as-applied challenge under the Equal Protection Clause, arguing that the Secretary discriminated against independent candidates such as themselves and in favor of major-party candidates in

various ways.[5]   These challenges are now before the court on the parties' cross-motions for summary judgment.

Because the December 2013 special election has already occurred, Hall's and Moser's earlier requests to be placed on the ballot for that election have become moot.   They now request (1) a declaratory judgment stating that the 3 % signature requirement for independent candidates cannot constitutionally be enforced with respect to special elections to seats in the U.S. House of Representatives and (2) injunctive relief prohibiting the Secretary from enforcing the

_____

5.   The amended complaint also asserts that Alabama's ballot-access scheme violates Hall's and Moser's rights as candidates and voters under the Fifteenth Amendment.   Am. Compl. (doc. no. 13-1) at 2-3.   During the preliminary-injunction hearing, their counsel advised the court that they would drop the Fifteenth Amendment claim in an effort to proceed expeditiously, but that they would pursue this claim and seek additional discovery should Hall not be placed on the ballot through a preliminary injunction.   Schoen Decl. (doc. no. 26-3) at 8-9.   However, after the court denied their request for a preliminary injunction, they agreed to submit the case for review without further argument or discovery on the Fifteenth Amendment claim. Accordingly, the court finds that they have abandoned their Fifteenth Amendment claim.

requirement with respect to a future special election to a House seat.

### A.   Subject-Matter Jurisdiction

Before proceeding to the merits of this case, the court will address whether it possessed, and retains, subject-matter jurisdiction over Hall and Moser's claims.   The Secretary identifies two facts that, he contends, bear on the court's jurisdiction and warrant reconsideration of the court's conclusion that Hall and Moser had presented and continued to present live controversies: (1) Moser was not registered to vote when the complaint was filed or when the special election was held, and (2), after the special election, Hall ran for office as a member of the Republican Party.

### 1.   Moser

Moser originally brought suit as a voter and as a prospective candidate.   Compl. (doc. no. 2) at 3-4. The Secretary argues that he lacked standing in either

capacity.

First, the Secretary argues that Moser lacked standing to bring this suit as a voter because, at the time the suit commenced and at the time of the December 2013 special election, he was not registered to vote in Alabama.   According to the affidavit of Alabama Director of Elections Edward Packard, Moser had been registered to vote in Baldwin County before 2009, but was purged from the voter rolls in January 2009 because he had not voted since the general election in 2004. Moser disputes that he has not voted since 2004; however, he has not offered any evidence to suggest that his name was on the voter rolls during the relevant time period.   Because Moser has presented no evidence to rebut this contention, the court credits it.[6]  As Moser was not registered to vote, it is open to question whether he had standing to proceed as a voter.

_____

6. Moser re-registered to vote on January 15, 2014.   However, that fact does not affect his standing to proceed when the complaint and amended complaint were filed during 2013.

Cf. Kelly v. Harris, 331 F.3d 817, 820 (11th Cir. 2003) (concluding that the appellant had no standing to challenge the requirement that candidates who wished to run in the Democratic Party primary take a loyalty oath when, as a registered Republican, he was ineligible to vote in that primary).

Second, although the Secretary does not dispute that Moser did have standing to sue as a prospective candidate at the time the original complaint was filed, he argues that Moser abandoned that claim by later amending his complaint to explain that, due to the "insurmountable obstacle for his candidacy" created by the challenged provisions, he "ha[d] withdrawn from that effort and now [sought] to support the candidacy of Plaintiff Hall."  Am. Compl. (doc. no. 13-1) at 5. Additionally, the amended complaint removed the claim for relief requesting to have Moser certified as an independent candidate on the Special Election ballot.[7]

_____

    7.  Moser argues that his original complaint, in which he brought suit as both a voter and a candidate, is the operative pleading for purposes of assessing (continued...)

Compare Am. Compl. (doc. no. 13-1) at 18, with Compl.
(doc. no. 2) at 9. Additionally, the Secretary notes,
Moser's attorney stated at the November 13
preliminary-injunction hearing that Moser's only
"claims are his First and Fourteenth Amendment rights
as a voter," and his "equal protection right ... to
vote for a candidate of his choice," because "he is not
a candidate anymore." Mot. Hr'g Tr. (doc. no. 36) at
2:17-4:1. That said, these representations may have
been intended to reflect only that Moser was not
seeking a preliminary injunction placing him on that
particular special election ballot, and not that he was
no longer seeking any prospective relief as a
prospective candidate, especially in light of Moser's
subsequent submissions to the court indicating his
future intent to run as an independent.

Moser also responds that, even if he does not have

_____

standing and that he had standing at that time to bring
his claim as a candidate. This is true but quite
beside the point; if he abandoned the claim he had
standing to pursue, he cannot proceed on it or on
another claim he did not have standing to pursue.

standing as a voter and has abandoned his claim as a candidate, he still has standing based on the violation of his "associational rights," including his right "to express his politics and to advocate for political positions, as a citizen, through an Independent candidate." Pls.' Resp. to Defs.' Suppl. Br. (doc. no. 65) at 5.  While the court recognizes that Moser does have an interest in expressing his views and advocating for the candidate of his choice, Moser has not identified--and the court has not found--any authority for the proposition that injury to these interests alone is sufficient to confer standing to challenge ballot-access laws.  Rather, a survey of the relevant case law indicates that individuals who challenge ballot-access laws can do so in one of two ways: as candidates or as voters.  See, e.g., Clingman v. Beaver, 544 U.S. 581 (2005); Anderson v. Celebrezze, 460 U.S. 780 (1983); Storer v. Brown, 415 U.S. 724 (1974); Am. Party of Tex. v. White, 415 U.S. 767 (1974); Jenness v. Fortson, 403 U.S. 431 (1971); Williams v. Rhodes, 393 U.S. 23 (1968); Baker v. Carr,

369 U.S. 186 (1962); **Swanson v. Worley**, 490 F.3d 894 (11th Cir. 2007); **New Alliance Party of Ala. v. Hand**, 933 F.2d 1568 (11th Cir. 1991); **Bergland v. Harris**, 767 F.2d 1551 (11th Cir. 1985).

In any event the court need not resolve the issues that go to whether Moser has standing.  Because Moser seeks exactly the same relief as Hall does, and because relief will be granted in Hall's favor, Moser would have nothing to gain from adjudication of his claims that he has not obtained through the vindication of one or more of Hall's.  Moser's claims are therefore moot and will be dismissed.

### 2.  Hall

The court turns next to Hall.  The Secretary argues that Hall's claims are moot because he is currently affiliated with the Republican Party and because he ran as a Republican in a local election held after the special election.  Hence, the Secretary asserts, Alabama's ballot-access laws for independent candidates no longer apply to Hall.  Although the court has

27

already rejected dismissal on a mootness ground, <u>see</u> <u>Hall v. Bennett</u>, 999 F. Supp. 2d 1266 (M.D. Ala. 2014) (Fuller, J.), the Secretary continues to press the argument in light of changed circumstances, and so the court addresses it here.

This court previously found that Hall's claims fall within the narrow exception to the mootness doctrine for cases that are "capable of repetition, yet evading review." <u>See</u> <u>S. Pac. Terminal Co. v. ICC</u>, 219 U.S. 498, 515 (1911). Election law cases routinely fall within this exception. A controversy is capable of repetition, yet evading review where two requirements are met.

First, "the challenged action [must be] in its duration too short to be fully litigated." <u>Weinstein v. Bradford</u>, 423 U.S. 147, 149 (1975) (per curiam). The parties have never disputed that the first prong of this test applies. <u>See</u> <u>Lawrence v. Blackwell</u>, 430 F.3d 368, 371 (6th Cir. 2005) ("Challenges to election laws are one of the quintessential categories of cases which usually fit this prong because litigation has only a

few months before the remedy sought is rendered impossible by the occurrence of the relevant election.").

Second, and as pertinent here, a plaintiff must show a reasonable expectation or a demonstrated probability that the controversy will recur. See Honig v. Doe, 484 U.S. 305, 319-23 (1988). There is conflicting authority regarding whether a plaintiff must also establish a reasonable expectation that the controversy will recur as to the same plaintiff in election-law cases. Compare Van Wie v. Pataki, 267 F.3d 109, 114 (2nd Cir. 2001), with Majors v. Abell, 317 F.3d 719, 723 (7th Cir. 2003), and Lawrence, 430 F.3d at 372. The Eleventh Circuit has recently, and without any discussion of this conflict, stated that it was applying the 'same complaining party' requirement in an election-law case, Arcia v. Florida Secretary of State, 772 F.3d 1335, 1343 (11th Cir. 2014) (explaining that the requirement had been met because the defendant had "not offered to refrain from" reprising the complained-of voter-roll-purging practice in the

future, and concluding, apparently on this basis alone, that "there is a reasonable expectation that the plaintiffs will be subject to the same action again"). This court will follow Arcia's lead and require Hall to show a reasonable expectation that he will again be subject, either as a candidate or as a voter, to the 3 % signature requirement for independent candidates during a special election.

Previously, the court rejected the Secretary's argument that the passage of the special election rendered the case moot, assuming without deciding that the 'same complaining party' requirement applied, and holding that Hall met it because it was reasonable to expect that Hall would run as an independent candidate in future special elections. That decision was based, in part, on a declaration submitted by Hall, wherein he stated that he intended to seek public office in Alabama as an independent candidate in a future special election. Hall Decl. (doc. no. 48-1) at 1 ("I intend to continue to seek elective office in Alabama in the future, including, but not limited to, the office of

U.S. Representative, and I intend to seek such elective office as an independent candidate, whether such election is a Special Election or a regular election."). Hall also stated that he intends to vote for independent candidates in future special elections. Id. ("I also intend to cast my vote in Alabama for an independent candidate for elective office in each Special Election and regular election in which I am eligible to vote.").

Since then, however, Hall has affiliated himself with the Republican Party and has run for office on the Republican ticket. The Secretary presents evidence that, according to Republican Party guidelines, members may not simultaneously be a Republican and also a member of another party or an independent. Therefore, the Secretary argues, Hall can no longer establish a reasonable expectation that he will run as an independent candidate in a future special election and, consequently, cannot show that he will be subject to the same challenged ballot-access laws in the future.

Hall's decision to run as a Republican in a local

election held after the special election at issue, though, does not significantly undermine his declaration of intent to run in the future as an independent. As a result, it does not alter the court's analysis. Hall is certainly free to affiliate with the Republican Party for now while retaining his right and persisting in his desire to run as an independent in the future. Nor is there any reason to believe this sort of party-swapping is unusual. Accordingly, the court finds that it is still reasonably likely that the controversy will recur as to Hall.

However, even if Hall were unlikely to run as an independent in the future, this still would not defeat the court's subject-matter jurisdiction. In his amended complaint, Hall brought suit not only as a candidate but also as a voter. Republican Party guidelines do not preclude registered Republicans from voting for independent candidates; indeed, it seems likely that they do so with some frequency. Considering Hall's declaration that he intends to vote

for independent candidates in future special elections,
the court finds it reasonably likely that his First and
Fourteenth Amendment rights as a voter in future
special elections would be burdened by the challenged
laws.

Moreover, courts of appeals have found election-law
controversies to be 'capable of repetition' with
respect to individual plaintiffs even without any
explicit statement by those plaintiffs (such as Hall
has made) that they intended to run or vote again. See
Lawrence, 430 F.2d at 371 ("Although Lawrence has not
specifically stated that he plans to run in a future
election, he is certainly capable of doing so, and
under the circumstances it is reasonable to expect that
he will do so. Neither is an explicit statement from
Shilo necessary in order to reasonably expect that in a
future election she will wish to vote for an
independent candidate who did not decide to run until
after the early filing deadline passed. The law at
issue is still valid and applicable to both Lawrence
and any independent candidate Shilo might wish to vote

for in future election years. Therefore, the controversy is capable of repetition.”). This court agrees with the Seventh Circuit that, “in an election case[,] the court will not keep interrogating the plaintiff to assess the likely trajectory of his political career,” Majors, 317 F.3d at 723, at least so long as the plaintiff could again confront the challenged law in running for office or voting for another candidate, and tells the court, in a sworn statement, that he anticipates doing so. Hall’s professed intention to run again as an independent and to vote again for an independent in a special election--both of which he is perfectly capable of doing--is enough to survive a mootness challenge.

Having found that this case continues to fall within the ‘capable of repetition, yet evading review’ exception to the mootness doctrine, the court proceeds to the merits of Hall’s claims.

## B.   First and Fourteenth Amendment Political Association and Participation

### 1.   Constitutional Framework

The First and Fourteenth Amendments afford all candidates vying for elected office, and their voting constituencies, the fundamental right to associate for political purposes and to participate in the electoral process.  See, e.g., Clingman, 544 U.S. at 586; Burdick v. Takushi, 504 U.S. 428, 433 (1992); Anderson, 460 U.S. at 787–88; Williams, 393 U.S. at 30.  Placing restrictions on candidates' and political parties' access to the ballot interferes with their right to associate for political purposes and the rights of qualified voters to cast their votes for the candidates of their choice.  Munro v. Socialist Workers Party, 479 U.S. 189, 193 (1986) (citing Williams, 393 U.S. at 30); see also Norman v. Reed, 502 U.S. 279, 288 (1992); Anderson, 460 U.S. at 786; Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184 (1979).  Ballot-access requirements that place more burdensome restrictions on certain types of candidates than on

others implicate rights under the Equal Protection Clause as well. See Williams, 393 U.S. at 30–31.

States, however, have "important and compelling interests in regulating the election process and in having ballot access requirements." Swanson v. Worley, 490 F.3d 902 (11th Cir. 2007) (quoting Green v. Mortham, 155 F.3d 1332, 1335 (11th Cir. 1998)). Most significantly, States have an "important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of political organization's candidates on the ballot." Jenness v. Fortson, 403 U.S. 431, 442 (1971). And, similarly, cases have "establish[ed] with unmistakable clarity that States have an 'undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot.'" Munro, 479 U.S. at 194 (quoting Anderson, 460 U.S. at 788-89, n.9). Ballot-access laws requiring preliminary showings serve to prevent "confusion, deception, and even frustration of the democratic process at the general election." Jenness, 403 U.S. at

36

442.

The Supreme Court has established an analytical framework for balancing the interests of political parties, candidates, and voters in engaging in the political process with the interests of States in conducting fair and effective elections. Under this framework, a court must first "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." <u>Anderson</u>, 460 U.S. at 789. Second, the court must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." <u>Id</u>. Third, "the court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." <u>Id</u>.

In this analysis, "the burden is on the state to 'put forward' the 'precise interests ... [that are] justifications for the burden imposed by its rule,'"

and to "explain the relationship between these interests" and the challenged provision. Fulani, 973 F.2d at 1544 (quoting Anderson, 460 U.S. at 789). "The State must introduce evidence to justify both the interests the State asserts and the burdens the State imposes on those seeking ballot access." Bergland, 767 F.2d at 1554.

Courts are to determine the appropriate level of scrutiny based on the seriousness of the burden imposed. "Regulations imposing severe burdens ... must be narrowly tailored and advance a compelling state interest," while "[l]esser burdens ... trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358–59 (1997) (citations and internal quotation marks omitted).[8]

---

8. Hall suggests that the court should not apply the approach outlined in Timmons. He contends that, because the ballot-access restriction at issue here imposes a greater burden on independent candidates during a special election (and its collapsed timeframe) (continued...)

than during a general election, the State must show
that the interests justifying the restriction are
commensurately greater in the context of a special, as
opposed to a regular, election.    In support of this
argument, Hall cites Jones v. McGuffage, 921 F. Supp.
2d 888 (N.D. Ill. 2013) (Tharp, J.).

In Jones, the plaintiffs raised a claim similar to
the one Hall advances here, challenging the application
of a signature requirement during the special election
held to fill Representative Jesse Jackson, Jr.'s
congressional seat in Illinois.    For a regular
election, independent candidates were required to
submit petitions with the signatures of at least 5 % of
voters within a 90-day petitioning window.    Id. at 898.
However, during the special election, independent
candidates were afforded only 62 days to collect the
same number of signatures.    Id.    The court
preliminarily enjoined the State from enforcing the law
and reduced the number of signatures required, in order
to lessen the burden, explaining that although the 5 %
requirement was constitutional during a regular
election, "because of the increased burden [during a
special election], the state necessarily must offer
some increased justification for its decision to
truncate the signature-gathering period while leaving
all other requirements in place."   Id.

Hall's argument (and this language drawn from
Jones) would make sense only if Hall had shown that
Alabama's ballot-access scheme for independent
candidates during regular elections represented a
constitutional boundary-line, such that any greater
burden or any lesser justification would tip the law
into unconstitutional territory.    He has not shown, and
no court has held, as much.    It is true that a
particularly burdensome requirement must be met by a
particularly significant justification.    It is
nonsensical, though, to contend that each and every
(continued...)

Eleventh Circuit case law offers helpful direction as to what sorts of ballot-access laws impose severe burdens, and what sorts do not. A ballot-access law imposes a severe burden if it "'freeze[s]' the status quo by effectively barring all candidates other than those of the major parties" and does not "provide a realistic means of ballot access." Libertarian Party of Fla., 710 F.2d at 793 (quoting Jenness, 403 U.S. at 439). If, however, a "reasonably diligent [] candidate [can] be expected to satisfy the signature requirements," then the burden is not severe, and the State's interests will generally be a sufficient justification. Id. (quoting Storer, 415 U.S. at 742).

---

time a State prevails in defending a ballot-access law by offering up a strong justification for the restriction, the constitutional floor is ratcheted upwards. See Libertarian Party of Fla. v. State of Fla., 710 F.2d 790,793 (11th Cir. 1983) (recognizing that any given signature threshold is "'necessarily arbitrary'" and "impossible to defend ... as either compelled or least drastic" (citation omitted)); see also Green v. Mortham, 155 F.3d 1332, 1339 (11th Cir. 1998) ("There is a range of fees and signature requirements that are constitutional, and the ... legislature is free to choose its ballot access requirements from that constitutional spectrum.").

## 2. Burden Imposed

Under this framework, the court must first assess whether the 3 % signature requirement for independent candidates in the context of a special election constitutes a severe burden or whether it is a reasonable, non-discriminatory regulation.

The parties agree that Alabama's 3 % signature requirement does not impose a severe burden in the context of a regularly scheduled election. See Swanson, 490 F.3d at 896 (recently upholding Alabama's ballot-access scheme in regular elections). Because Alabama's election scheme has not meaningfully changed since the decision in Swanson, the Eleventh Circuit's application of the Supreme Court's balancing test to Alabama's 3 % signature requirement in Swanson provides a good starting point for the court's analysis in this case.

In Swanson, the Eleventh Circuit held that Alabama's 3 % signature requirement, by itself and in combination with Alabama's June filing deadline, did not violate the First and Fourteenth Amendments. Id.

**41**

at 903–10.  In reaching this conclusion, it focused on
Jenness v. Fortson, in which the Supreme Court upheld
Georgia's 5 % signature requirement for regular
elections in combination with a June filing deadline.
Id. at 906.  The Eleventh Circuit reasoned that
Alabama's ballot-access scheme was permissible because
it was less restrictive than Georgia's.  Id.  For
example, whereas Georgia required prospective
independent candidates to submit the signatures of 5 %
of all registered voters, Alabama required the
signatures of only 3 % of actual voters.  Id.  The
relative timeframe for collecting signatures in
Georgia, 180 days, also was significantly shorter than
the timeframe in Alabama, which the court characterized
as being "unlimited."  Id.  Finally, the June deadline
for filing signatures did not put independent
candidates at a disadvantage as compared to major-party
candidates, who faced a primary election on that date.
Id.

The appellate court placed significant weight on
the Alabama law's inclusion of many of the same

"alleviating factors"--factors that eased the burden of gathering signatures--as were present in a previously upheld Florida scheme for regular elections.  See Libertarian Party of Fla., 710 F.2d at 793.  The Swanson court particularly emphasized that the Alabama scheme, unlike the schemes in Florida and Georgia, imposed a submission deadline but no start date, and, therefore, no limit on the time period for gathering signatures.  This "unlimited petition window" meant "a diligent independent or minor party candidate could meet the filing deadline by collecting signatures many months" in advance, thus significantly lessening the scheme's burden.  Swanson, 490 F.3d at 909.

Thus, the Swanson court held in the context of regular elections that Alabama's 3 % signature requirement was a reasonable, non-discriminatory regulation that fell within the "spectrum of constitutional legislative choices" and did not impose a "severe burden."  Id. at 907, 910.

The Secretary does acknowledge that the truncated special-election schedule increased the burden imposed

by Alabama's 3 % signature requirement--as compared to the burden deemed not "severe" in Swanson--by reducing the time Hall could gather signatures.    However, according to the Secretary, reducing the time Hall had to petition did not necessarily render the burden imposed by the 3 % signature requirement severe. Rather, the Secretary argues that the burden imposed by the ballot-access requirements was less severe than the burdens at issue in Jenness and Libertarian Party of Florida and, therefore, permissible as a matter of law.

To reach this conclusion, the Secretary urges the court to compare the percentages of voters' signatures required per day to satisfy the ballot-access requirements in Jenness and Libertarian Party of Florida to the percentage of voters' signatures required per day to get on the ballot in Alabama's special election.  In Jenness, the Supreme Court upheld a regime requiring independent candidates in regular elections to obtain signatures from 5 % of registered voters in 180 days, 403 U.S. at 440-42, and, in Libertarian Party of Florida, the Eleventh Circuit

**44**

upheld a regime requiring independent candidates in regular elections to obtain signatures from 3 % of registered voters in 188 days, 710 F.2d at 790, 794. In this case, Hall was required to obtain signatures from 3 % of qualified electors who voted in the last gubernatorial election--the Secretary calculates this to amount to 1.4 % of registered voters--in 106 days, the amount of time the Secretary argues Hall had to petition.   The Secretary argues that, even taking Hall's contention--that he had only 56 days--as true, the burden imposed during the special election was still less onerous than that imposed by the ballot-access law upheld in Jenness.   Thus, according to the Secretary, the Alabama regime does not, as a matter of law, impose a severe burden.   See Swanson, 490 F.3d at 907 (upholding a 3 % signature requirement because a 5 % requirement, in combination with an even earlier deadline, had been upheld in Jenness).

The Secretary's calculation, however, ignores the Supreme Court decision in Anderson, which requires the court to consider cumulatively the burdens imposed by

the overall scheme, and not mechanically to compare percentages of signatures required per day. See Anderson, 460 U.S. at 788; see also Clingman, 544 U.S. at 607-08 ("A panoply of regulations, each apparently defensible when considered alone, may nevertheless have the combined effect of severely restricting participation and competition.") (O'Connor, J., concurring). The Secretary's approach is precisely the sort of "litmus-paper test" analysis the Supreme Court prohibits. Anderson, 460 U.S. at 789; see also id. at 789-90 ("The results of this evaluation will not be automatic; as we have recognized, there is no substitute for the hard judgment that must be made." (citation and internal quotation marks omitted)).

Such a mechanical approach does not adequately address the often significant differences between elections. In other words, there are 'elections,' and there are 'elections.' As everyone knows, there are elections for President and Governor, where voter interest and voting likelihood are likely highest. There are election for other statewide federal and

46

state offices where voter interest and voting likelihood may be lower but still relatively great. There are elections for non-statewide federal and state offices and for local offices were voter interests and voting likelihood may be, relatively speaking, significantly lower. There are elections held on the Tuesday after the first Monday in November, that is, 'election day,' when voters are most likely accustomed to voting. And there are elections in other months when voters are likely much less accustomed, and thus less likely, to vote. There are also regular elections that recur at stated intervals fixed by law, and thus when voters are more likely accustomed to voting, and there are special elections, for which there are no predetermined dates. When it comes to voter interest and voting likelihood in a special election, therefore, it is one thing for the special election to be piggybacked onto a regular election for a statewide federal or state office on 'election day'; it is quite another thing when it is held by itself 'off season,' that is, on a day other than election day. The general

circumstances in which the signature requirement can occur are many and can vary significantly. And it is against this backdrop that the court now considers the specific circumstances presented.

This court must undertake an examination of the evidence in the record, and draw a full picture, to determine whether a reasonably diligent candidate could have been expected to satisfy the 3 % signature requirement within the petitioning time allotted for the special election here; if not, the law imposes a severe burden. Applying the proper test, the court finds that the challenged ballot-access laws, in the context of the special election set here, did impose a severe burden.

First, the 3 % signature requirement imposed a substantially heavier burden on Hall than it would have during a regular election like the ones at issue in Swanson and the cases it discusses. In addition to the truncated petitioning window, the lack of preparation time and low voter interest characteristic of off-season special as compared to regular elections

**48**

combined to make it impossible for a reasonably diligent candidate, such as Hall, to satisfy the 3 % requirement.

To begin with, the evidence is clear that Hall was a reasonably diligent candidate.  Within three weeks of Representative Bonner's announcement of his retirement, Hall had begun to collect petition signatures (indeed, he contacted the Secretary of State's office to begin the process two weeks after the announcement).  Hall worked "tirelessly" for two months to obtain the requisite number of signatures by visiting numerous businesses and soliciting at public events including "charity runs, festivals, yard sales, concerts, sporting events, a gun show, and others."  Hall Decl. (doc. no. 25-1) at 2.  He received assistance from social and work contacts and friends, and he and his wife knocked on about 5,000 doors.  Although the response rate was far from insubstantial--he obtained one signature for every dozen houses visited--he would have had to knock on over 71,000 doors to obtain the required number of signatures from canvassing alone.

Although Hall placed an ad for a paid signature-gatherer, the only person who responded would have charged about $ 4.00 per signature; at this rate, it would have cost him a prohibitive sum--over $ 23,000--to get the bare minimum number of signatures. See Hall Decl. (doc. no. 25-1) at 3.

Moreover, the amount of time Hall had to collect signatures was dramatically reduced from the time available in the regular-election context. Although the parties dispute how many days Hall had to petition in the December 2013 special election, it is undisputed that his time was not unlimited. In contrast, in a regularly scheduled election, there is no required start date or limited period for collecting signatures, and such regular elections are held at regular intervals with the dates and deadlines predetermined. See Swanson, 490 F.3d at 904. Indeed, it appears that an independent candidate wishing to run in a regular election a decade from now can, under Alabama law, begin petitioning today. In a special election, however, a prospective independent candidate cannot

begin collecting signatures until a vacancy is announced. Further, because the Secretary of State's regulations state that the petition used must have the date of the special election on it, candidates seeking to comply with the letter of the law must wait until the date for the special election is revealed to begin petitioning. In upholding the 3 % signature requirement in the context of a regular election, the Swanson court singled out the unlimited petitioning time as a particularly important factor alleviating the burden imposed. 490 F.3d at 910. The truncated timeframe in this special election, whether it was 56 or 106 days, materially distinguishes this case from Swanson.[9]

---

9. Cassity, the Chairman of the Alabama Constitution Party, concurred that this short period for signature-collection would make it very difficult for an independent candidate to meet the threshold. "Notwithstanding our great desire to run a Constitution Party candidate in the Special Election for the seat Mr. Bonner vacated, we ultimately concluded that the combination of the short time frame and the number of signatures required would make it virtually impossible for any small party [or] independent candidate to gain access to the ballot and certainly made it impossible (continued...)

Second and relatedly, Hall's ability to petition was further burdened by the lack of preparation time in advance of the off-season special election. The preparation required for a successful signature drive can be significant and take many months; candidates must raise funds, organize their campaigns, and recruit and train campaign staff, including volunteer or paid signature-gatherers. Prospective independent candidates in a regular election not only have unlimited petitioning time--they also have unlimited time to prepare to petition. In a special election, however, independent candidates, who cannot rely on party infrastructure to support their efforts, do not have "any period of time ... to meaningfully prepare for the arduous signature drive." Winger Decl. (doc. no. 25-4) at 4.[10]   This was certainly the case in the December

---

for our Party and we abandoned our efforts, based solely on this very severe burden imposed by the signature requirement and the short time frame (a time frame which we could not even ascertain until the very end of July or beginning of August)." Cassity Decl. (doc. no. 25-3) at 4.

10. The Secretary challenges Winger's expert (continued...)

2013 special election; Hall could not have predicted Bonner's resignation and, therefore, could not have begun to prepare until a short time before the special election.  He and Moser specifically stated that this hampered their efforts to collect signatures.

Third, Hall encountered difficulty obtaining signatures because voters were less aware of or interested in the election before the date of the special election was announced on July 29, 2014.  Hall

testimony.  The court declines to consider Winger's testimony to the extent he engages in legal analysis or draws legal conclusions.  However, the court disagrees with the Secretary that the remainder of Winger's testimony fails to satisfy Federal Rule of Evidence 702.  Since 1960, Winger has devoted considerable time to researching and to writing about state election laws.  Winger is the editor of Ballot Access News, in which he documents the history and application of ballot-access laws in the United States, and he is the author of numerous articles on the topic.  Courts around the country, including courts in this district, have qualified Winger as an expert to testify about the effect of ballot-access laws.  See, e.g., Swanson, 490 F.3d at 898.  Based on his knowledge and experience, Winger is certainly qualified to discuss the history of ballot-access laws in Alabama, how they compare to ballot-access laws in other States, and how a truncated special-election schedule affects prospective independent candidates' access to the ballot, both generally and in this special election.

stated in his declaration that low voter interest was particularly burdensome early in his signature campaign. <u>See</u> Hall Suppl. Decl. (doc. no. 26-1) at 2 ("When I first started trying to obtain signatures before the Governor announced that the Special Election would be held and on what dates the primaries and general Special Election would be held, I found it especially hard to obtain signatures because people did not seem to know about the Special Election or have any interest in it. I had to explain the situation and further explain that we did not yet know when the election I was asking to be on [the] ballot for would be held. This led many people just to dismiss me without any interest in signing."); <u>see also</u> Winger Suppl. Decl. (doc. no. 26-2) at 7 ("[B]efore the Special Election and its dates were announced by the Governor, gathering ballot signatures for an independent candidate in Mr. Hall's situation would be much more difficult because of the lack of interest and focus among citizens in general."). As other courts have noted, voter apathy is high months before a

primary election and, especially for independent and minor party candidates, support may not "coalesce until comparatively late in the cycle." Clingman, 544 U.S. at 607 (citing Anderson, 450 U.S. at 791–92). Voter apathy may impose less of a burden in a regular election, where independent candidates have unlimited time to petition. However, in an off-season special election, where prospective candidates are under time pressure to collect signatures, the lack of interest or awareness early in a signature drive is especially burdensome.

Finally, the court looks to history--whether any independent candidates have succeeded in gathering enough signatures to appear on a special election ballot--as an indicator of whether the 3 % requirement "'freeze[s]' the status quo by effectively barring all candidates other than those of the major parties" when applied in a special election. See Libertarian Party of Fla., 710 F.2d at 793 (quoting Jenness, 403 U.S. at 439). "Past experience will be a helpful, if not always unerring guide: it will be one thing if

independent candidates have qualified with regularity and quite a different matter if they have not." Storer, 415 U.S. at 742.

The ballot-access history here supports the conclusion that the 3 % requirement imposes a severe burden in the context of special elections. While an independent or minor-party candidate has been able to comply with the signature requirement in general elections in the First Congressional District in the past, no independent candidate has met Alabama's signature and deadline requirement in either of the last two special congressional elections, including in 1989, when the signature requirement was only 1 %. Indeed, since ballots were first printed by the State in 1893, no independent candidate has ever appeared on the ballot in any congressional special election in the State.[11]   Winger Second Suppl. Decl. (doc. no. 29-1) at

---

11. Hall also brings the court's attention to the ballot-access laws of Alabama's neighboring States. According to Winger, in a special election for Congress, Georgia and Florida require no signatures for independent candidates, and in Mississippi and (continued...)

1-3.

The Secretary has not offered any evidence to rebut the testimony submitted by Hall demonstrating that the burden of Alabama's 3 % signature requirement was severe.   All the Secretary offers is the suggestion, unsupported by any evidence, that Hall's inability to obtain the requisite number of signatures is also consistent with the possibility that he lacked a "significant modicum of support."   State Defs.' Mot. to Dismiss or for Summ. J. (doc. no. 23) at 27 (quoting Jenness, 403 U.S. at 442).

The court does not agree.   Hall's efforts were futile not because he was a particularly unappealing candidate--indeed, he was able to obtain over 2,000

---

Tennessee, only 25 signatures are required.   Winger Decl. (doc. no. 25-4) at 4.   While the contrast is stark, the Eleventh Circuit has repeatedly rejected the argument that the ballot-access regimes of other States are relevant when inquiring into the constitutionality of the regime at issue.   See, e.g., Swanson, 490 F.3d at 910 (disregarding Winger's testimony that Alabama has the "second toughest ballot access restrictions" among all States in the 2002 election, because "the legislative choices of other states are irrelevant" (citing Libertarian Party of Fla., 710 F.2d at 794)).

57

signatures--but because a truncated petitioning window, lack of preparation time, and low voter interest combined to create a severely burdensome ballot-access scheme offering reasonably diligent independent candidates no realistic means of ballot access.

Because the "Constitution requires that access to the electorate be real, not 'merely theoretical,'" requirements for ballot access "demanded [by the State] may not be so excessive or impractical as to be in reality a mere device to always, or almost always, exclude parties with significant support from the ballot." **Party of Tex. v. White**, 415 U.S. 767, 783 (1974) (quoting Jenness, 403 U.S. at 439). In light of the evidence Hall has presented--that he was diligent in attempting to gather signatures, but unsuccessful in light of the dramatically shortened timeframe, the lack of preparation time, and low voter awareness and interest before the date of the election was announced--the court concludes that Alabama's 3 % signature requirement, in the context of an off-season special election, imposes a severe burden, and, indeed,

does not afford independent candidates "real" access to the ballot.

### 3.  The State's Interests

Having found the burden on Hall's constitutional rights to be severe, the court can uphold the regulation in the context of special elections as presented here only if it is "narrowly tailored and advance[s] a compelling state interest." Timmons, 520 U.S. at 358.  The Secretary advances the following interests as justification for the 3 % signature requirement (and accompanying deadline for petition submission) in the context of special elections: (1) ensuring that independent and minor-party candidates have a significant modicum of support, (2) eliminating party splintering and factionalism, (3) encouraging fair treatment between independent and minor-party candidates and major party candidates, and (4) having sufficient time to verify signatures.

The interests put forth by the Secretary are undoubtedly important.  See Swanson, 490 F.3d at 910–912.  However, the court need not decide whether these

interests are 'compelling' because, even if they are, the Secretary has not shown that the 3 % signature requirement is narrowly tailored to advance these interests. The Secretary need not prove that it would be impossible to serve these interests without the 3 % signature requirement; however, he must justify "the extent to which [these] interests make it necessary to burden the plaintiff's rights." Anderson, 460 U.S. at 789; see also Munro, 479 U.S. at 194-96.

The Secretary has failed to provide any evidence or explanation as to why applying the 3 % signature requirement in the context of special elections as presented here is necessary to achieve the interests articulated. Although he need not prove that this is the precise threshold below which the State's interests would not be served, see Libertarian Party of Fla., 710 F.2d at 793, he has offered no evidence to suggest that even dramatically lower thresholds (such as the 1 % signature requirement previously in place) would not adequately have served these interests during a special election. Because he has failed to meet his burden,

_Fulani_, 973 F.2d at 1544, the court finds that the ballot-access laws are not narrowly tailored to advance a compelling interest.

Thus, summary judgment will be granted in favor of Hall on his First and Fourteenth Amendment claim.


### C.   Equal Protection

Hall also asserts that his constitutional right to equal protection was violated by the Secretary's actions, although he gives this argument short shrift in his briefing.   In the Eleventh Circuit, "equal protection challenges to state ballot-access laws are considered under the _Anderson_ test"--that is, "a balancing test that ranges from strict scrutiny to a rational-basis analysis, depending" on whether or not the burden imposed by the laws is severe.   _Fulani_, 973 F.2d at 1543.   As explained below, Hall has failed to show the existence of a genuine dispute as to whether his right to equal protection was violated.

It is well established that providing ballot access to political parties through the primary-election

process and to independent candidates through signature petitions does not violate the Equal Protection Clause of the Fourteenth Amendment.  <u>Jenness</u>, 403 U.S. at 440–42.  Rather, such laws provide two constitutionally permissible alternative means of ballot access; neither method "can be assumed to be inherently more burdensome than the other."  <u>Id.</u> at 441.

Perhaps in light of this case law, Hall does not appear to argue that the shortened timeframe rendered the ballot-access process for independent candidates inherently more burdensome than that available to party candidates.  Instead, he points to discrete actions by the Secretary that he contends discriminated in favor of political parties and against independent candidates.  Hall contends that the Secretary discriminated against independent candidates, first, by allowing Democratic candidates to be certified one hour past their deadline, and, second, by creating a special "Instant Primary Ballot" for UOCAVA voters.

Hall first notes that the Secretary allowed the Democratic Party to certify candidates one hour after

the deadline had passed, but did not agree to reduce the number of signatures needed for independent candidates to qualify. The Secretary explained, reasonably, that he made the exception for the Democratic Party because the party head had not been informed of the exact deadline. In any case, the extension the Democratic Party received was de minimis, and Hall nowhere suggests that such marginal flexibility was denied to, or would have benefited, any independent candidate. If he had been a few signatures short and was denied an extra hour to gather them, Hall's equal protection argument might hold more water. Here, differential treatment (if indeed there was any) did not impose a significant burden and had a rational basis. Indeed, the record also demonstrates that the Secretary's office made an accommodation for Hall as well by providing him with a unique signature petition header, instead of requiring him to submit petitions with the election date on them.

The creation of the "Instant Primary Ballots" likewise did not impermissibly discriminate in favor of

political party candidates.   These absentee ballots,
sent to military and overseas voters, had to list the
names of all Republican candidates participating in the
primary runoff because federal law required the ballots
to be mailed before the winner of the runoff was known.
Although    the    inclusion    of    multiple    Republican
candidates    on    the    ballot    undoubtedly    placed    the
eventual party nominee at a significant disadvantage,
it is true that the eventual losers of the runoff
obtained, in a technical sense, some advantage over
independent candidates in that they were allowed to
appear on the ballot despite not being their party's
nominee and without submitting the petition signatures
required of an independent candidate.   In a practical
sense, however, the eventual losers of the runoff were
not given a free pass; they had already demonstrated a
(very) significant modicum of support by receiving a
sufficient share of the votes in the initial primary to
warrant participation in the runoff.

If mere affiliation with a major party ordinarily
earned a candidate other than that party's nominee a

place on the UOCAVA ballot, that might raise
significant equal protection concerns.  The court need
not decide whether the burden imposed on independent
candidates in such a case would be severe, however,
because in the context of the primary runoff, the
actions of the Secretary were unquestionably justified
and would pass strict scrutiny.  Including Republican
runoff candidates on the instant ballot permitted the
State to comply with federal law.  Had all the
Republican candidates participating in the runoff not
been included, military and overseas voters wishing to
cast their votes for the Republican candidate would
have had to write in that candidate's name (and
election administrators would have had to count
numerous write-in ballots by hand).  Indeed, it is
doubtful that the federal court then tasked with
protecting the UOCAVA rights of military and overseas
votes would have accepted this alternative.

    Other than by applying the 3 % signature
requirement, there is no indication that the Secretary
acted in an unconstitutional manner towards independent

candidates in general or towards Hall in particular. Thus, summary judgment will be granted in favor of the Secretary on Hall's equal protection claim.


## IV. Appropriate Relief

Hall requests a declaratory judgment that the 3 % signature requirement for independent candidates cannot constitutionally be enforced with respect to future off-season special elections to seats in the U.S. House of Representatives. He also seeks an injunction prohibiting the Secretary from enforcing the 3 % requirement.

According to his filings, Hall seeks both facial and as-applied relief. Facial relief--that is, relief extending to all prospective independent candidates, and not just to Hall--is appropriate here. Nevertheless, that facial relief is limited. The court does not hold that the 3 % signature requirement can never be enforced, only that it cannot be enforced in the context of an off-season special election occurring on a similarly limited timeframe. Given the

Secretary's concession at oral argument that, typically, off-season special elections will be held on an even shorter timeline than occurred in the December 2013 election in which Hall attempted to stand as a candidate, this may prove to be a distinction without a difference.  <u>See</u> Mot. Hr'g Tr. (doc. no. 71) at 33:18-23.  However, the court recognizes that a special election could theoretically be held with much more lead time, and that this might alter the court's analysis as to the severity of the burden imposed on independent candidates seeking access to the ballot. (Nevertheless, it is evident that this is a problem that should be addressed legislatively, either to accommodate the specific but typical off-season special election presented here or, more generally, all reasonably conceivable types of special elections, including the one here.)

In the court's view, declaratory relief is sufficient, in light of the court's confidence that the Secretary will act accordingly.

An appropriate judgment will be entered.

DONE, this the 30th day of September, 2016.


           /s/ Myron H. Thompson
        UNITED STATES DISTRICT JUDGE